UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

UNITED STATES OF AMERICA                    13-CR-21 (PAC)

                -against-

BERTON HOCHFELD

------------------------------------------------------------- X


**SENTENCING MEMORANDUM OF BERTON HOCHFELD**


SERCARZ & RIOPELLE, LLP
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone: 212-586-4900

## **PRELIMINARY STATEMENT**

Defendant Berton Hochfeld ("Mr. Hochfeld" or "Hochfeld") respectfully submits this memorandum in aid of his sentencing. Although the Presentence Report ("PSR") includes a description of Mr. Hochfeld's background and the offense, we submit this memorandum to provide additional detail regarding these matters, so that the Court will have a fully nuanced picture of Mr. Hochfeld and his conduct when it imposes its sentence on him.

This case presents a very unusual set of circumstances. In this criminal case, Mr. Hochfeld's interests and those of his victims coincide to a degree that is atypical. It is in Mr. Hochfeld's interest, and the interests of his victims, that Mr. Hochfeld continue the project he began even before he was arrested – devoting his energy to repaying the victims of his crimes by selling everything he owns of value, and by continuing to build a modest business that may, over time, permit him to make full restitution for his crimes. If the Court imposes a sentence of incarceration on Mr. Hochfeld, it will ensure that his efforts to repay his victims must end because his business will not survive a suspension of activity. That may be a just result, if justice requires retribution rather than restitution. On Mr. Hochfeld's behalf, we respectfully contend that is the wrong outcome in this case, and a number of Mr. Hochfeld's victims agree with us.

When the Court considers all of the facts and circumstances relevant to Mr. Hochfeld's sentencing, we respectfully submit that the Court should find that a sentence of probation with two conditions is appropriate to meet all of the sentencing goals embodied in 18 U.S.C. § 3553(a). The two conditions we submit that the Court should impose are: 1) a substantial term of home confinement; and 2) a condition requiring that Mr. Hochfeld pay thirty percent of his income net of taxes in restitution during the term of his probation.

## STATEMENT OF FACTS

**A.    The Nature of Hochfeld's Conduct and His Personal History**

The PSR contains a straightforward description of Mr. Hochfeld's conduct – bluntly, he stole funds from those who invested in a hedge fund he managed, by withdrawing funds he was not entitled to.  PSR ¶¶ 8-24.  Together with the Fund Administrator, Hochfeld sent out statements to his investors that did not account for his theft.  PSR ¶ 11.  The PSR also contains a description of Hochfeld's personal and family background, and it describes his employment and medical history.  See PSR ¶¶ 49-69.  However, there are a several aspects of Mr. Hochfeld's conduct and personal history that require further exposition, in order to fully understand Mr. Hochfeld's nature and the events that led him to commit the crime for which he must be sentenced.

### 1.  Mr. Hochfeld's Conduct

Mr. Hochfeld's arrest in this case is his first arrest for any crime.[1]  His long term friends – many of whom invested in the Heppelwhite Fund ("Heppelwhite" or the "Fund") and were victimized by Hochfeld – are shocked by his conduct.  But those same friends stand by Mr. Hochfeld, even though he has admitted stealing their money.  Those who have written to the Court note the genuineness of Mr. Hochfeld's remorse, and observe that little good will come of

---

[1]   The PSR notes that Hochfeld was barred from association with an investment advisor and enjoined from further violations of the securities laws by a 2006 SEC civil enforcement judgment, and the PSR adjusts Hochfeld's base offense level upward by two levels for Hochfeld's violation of this decree.  Mr. Hochfeld's violations of the securities laws in 2006 were not prosecuted criminally, and they were technical in nature.  In addition, Mr. Hochfeld's violations of the securities laws in 2006 did not involve any theft from any person or client, and the SEC's proof did not include any evidence that Mr. Hochfeld's conduct caused a loss to anyone.  Mr. Hochfeld's 2006 transgressions consisted of trading for his own account in certain securities too close in time to the issuance of his research reports about those same securities, and without adequate disclosure in his reports that he might trade in the companies being analyzed.  The SEC never contended and certainly never proved that Mr. Hochfeld's research reports were likely to affect the prices of the securities on which he reported, and thus, there was no proof to suggest that Mr. Hochfeld's conduct amounted to a fraud on the market or that it harmed anyone.  The amount of fine and financial penalty paid by Mr. Hochfeld was less than the amount it would have cost him to defend the matter at trial.  In short, the conduct involved in the SEC's 2006 civil enforcement action against him is very different from the conduct at issue here, and the Court should not treat Mr. Hochfeld as a "recidivist."

2

a jail sentence.  Indeed, such a sentence will effectively end Mr. Hochfeld's ability to repay those he has harmed.

For example, Richard Grace, who is a longtime friend of Hochfeld's and who was an investor in the Heppelwhite Fund, writes that he "was shocked to hear of Bert's misappropriation of funds as I had long considered him a person of the highest ethical standards."  Exhibit A. Despite having been victimized by Mr. Hochfeld, Mr. Grace does not believe Mr. Hochfeld should be incarcerated, "because he is well on the path to redemption under his own influence and incarceration would only tend to inhibit both his repayment of the funds and his personal redemption."  Id.

Similarly, Frank Jerd, who has known Hochfeld for more than 30 years and who invested in the Heppelwhite Fund "struggle[s] to understand Bert's transgression which is so out of character with the person I know."   Exhibit B.  Mr. Jerd observes that "Bert's punishment will be born out in his remaining years every day" as he suffers with the remorse he feels at harming his friends, and notes that if Mr. Hochfeld "is incarcerated he will not have the opportunity to make restitution to the investors or the government." Id.

Another investor, Scott Wagoner, writes that Mr. Hochfeld was "broken and remorseful" when he spoke to Mr. Wagoner about his crimes.  Mr. Wagoner asks the Court "to allow Bert to 'right his wrongs' for those who have been most impacted by his wrongdoing." Exhibit C.  The only way for Mr. Hochfeld to "right his wrongs" is to repay his investors.  And the only way Mr. Hochfeld can possibly do that is if he remains at work while being compelled to pay a significant portion of his income to his victims, in the form of restitution payments.

Indeed, Mr. Hochfeld's conduct prior to his arrest is instructive.  After the Administrator of the Heppelwhite Fund resigned, Mr. Hochfeld was confronted with a choice.  He could enlist

3

another conspirator and continue his criminal behavior; he could continue his criminal behavior on his own; he could try to flee, perhaps taking Heppelwhite's significant liquid funds with him; or he could stop his wrongdoing and start doing everything possible to make amends to his victims. To his credit, Mr. Hochfeld chose the latter course.

On October 11, 2012, Mr. Hochfeld wrote his investors and explained what he had done. A copy of his letter to the investors is attached as Exhibit D. Shortly thereafter, on October 22, 2012, Mr. Hochfeld met with the majority of the Heppelwhite investors and confessed openly that he had misappropriated funds from Heppelwhite. Aspects of this meeting are described in paragraphs 15, 16 and 17 of the PSR. During the October 22 meeting, Mr. Hochfeld told the investors that he would sell everything of value he owned (antiques and furnishings) in an attempt to make them whole. Mr. Hochfeld also committed to liquidate the Heppelwhite Fund promptly, and place the proceeds of the liquidation in an account over which he would have no control. It was Mr. Hochfeld's plan to pay out the funds on a pro rata basis to the Heppelwhite investors as soon as a forensic accounting firm had fully examined the books and records of the Fund to determine each investor's equity interest in the fund. Immediately following the meeting, an escrow account was set up, and within a week, Heppelwhite was liquidated. The proceeds of the liquidation – more than $6 million -- were placed in escrow.

Almost immediately after these funds were placed in escrow, the Securities and Exchange Commission (the "SEC") sued Hochfeld and Heppelwhite, and obtained an order freezing their assets. Hochfeld has cooperated fully with the SEC, and expects to continue to do so. By cooperating with the SEC to date, Hochfeld has spared the Heppelwhite investors significant expense, because the SEC has not had to appoint a receiver to investigate Hochfeld and marshal his assets, liquidate the Fund, and ultimately distribute the proceeds of a lengthy

4

receivership, all paid out of the funds marshaled by a receiver.  Instead, the SEC will monitor the process of orderly liquidation that Mr. Hochfeld has begun to ensure that it is accomplished properly, sparing the Heppelwhite investors thousands of dollars in fees that would ordinarily be charged by a receiver against their recovery.

As part of Mr. Hochfeld's commitment to making his investors whole, he has consigned his entire collection of antiques to the Christie's and Doyle's auction houses for sale.  Contracts by which Hochfeld has consigned all his property of value to Christie's and Doyle's are attached as Exhibits E and F.   Again, this entire process began before the SEC obtained its freeze order, and the SEC has monitored Mr. Hochfeld's actions as he has begun to sell off his property for the benefit of his victims.  A court order in the SEC's case against Mr. Hochfeld permitting these sales is attached as Exhibit G.  All proceeds from the sales of Mr. Hochfeld's property will be placed in an escrow account over which he will have no control.  And thereafter, the proceeds will be distributed to the victims on a pro-rata basis, with the SEC monitoring every step of the process, but sparing the victims the cost of a receiver.

The first sale of a part of Mr. Hochfeld's property at Christie's occurred on June 7, 2013, and resulted in proceeds of more than $100,000, which will be paid into an escrow account and paid out to the Heppelwhite investors after deduction of Christie's fees.  Additional sales are scheduled over the next several months, with the expectation that they will produce many thousands more in funds that will be paid to the investors.  All of these sales will be conducted with the cooperation and approval of the SEC, to minimize the investors' expense.

As the foregoing discussion indicates, Mr. Hochfeld has made an extraordinary effort to make good on his obligations to those whom he harmed.  This in no way excuses his conduct, which he recognizes was deplorable.  But the way in which Mr. Hochfeld has behaved does say

something about his fundamental decency.  He is not a cold blooded fraudster or thief, and even

his victims recognize this about him.  As his long-time friend Kal Crawford, who was also an

investor in the Fund writes:

> I was extremely disappointed to hear of [Bert's] and the
> Fund's situation in September 2012 – shutting down the
> fund, then the subsequent charges for Bert (for Securities
> Violations, and Fraud …) and guilty pleas on the two
> charges.  When all this came to light for the Fund's
> investors, Bert did not shy away from the situation, unlike
> his fund administrator (Scott Herckis) and the Fund's
> clearing house (JP Morgan Clearing) and my account
> custodian (Garwood).  All three have been uncooperative,
> legal and obstructive in their correspondence and
> demeaning in their approach to help sort this out.  Bert, on
> the other hand, held investor calls to throw himself at the
> mercy of the Fund's investors admit to what he did, take
> responsibility for what he did, and to help kick off the
> forensic accounting necessary to distribute the funds now
> that the Fund's assets have been liquidated.  Needless to
> say, I feel thre should be several other defendants involved
> here beyond Bert, as Bert has been humble and genuine in
> his approach to help make the Fund's investors whole and
> to answer the tough questions straight from the Fund's
> investor's mouths.  In fact I remember one such call where
> Bert was put to task about the Fund's financial situation,
> his role in creating the situation as remorsefully took
> responsibility for his actions and offered an apology backed
> up with a genuine resolve to make every Fund investor
> whole. …Bert stood up and took responsibility and then
> went to work to help every fund investor recover as much
> money now as he possibly could.

See Exhibit H.

### 2. Hochfeld's Physical and Psychiatric Health

Mr. Hochfeld is now nearly 67 years old.  He has a significant hearing deficit in both

ears, which is described in a report submitted by his doctor, Samuel Selesnick, M.D.  A copy of

Dr. Selesnick's report is attached as Exhibit I.  While he is not critically ill, Mr. Hochfeld is

overweight, has high blood pressure, high cholesterol and diabetes. He takes a variety of medications daily for his medical conditions. See PSR ¶ 59.

Given Mr. Hochfeld's medical conditions, the fact that neither of his parents lived for an extraordinarily long time (indeed, his father died extraordinarily young, PSR ¶ 49), and an average life expectancy for United States citizens of 78 years, the imposition of a lengthy prison term on Mr. Hochfeld would likely be a "life sentence." And a prison sentence of any length will prevent Mr. Hochfeld from continuing the process of building the business described in paragraph 65 of the PSR, which is already earning $5,700 per month in gross income. The fact of the matter is that Mr. Hochfeld has a few good years left in which to work to repay his victims. But not very many.

Section 5H1.1 of the Sentencing Guidelines specifically permits the Court to consider a defendant's age in determining whether to impose a guidelines sentence. Given that a sentence within the sentencing range will effectively be a "life sentence," we respectfully submit that Mr. Hochfeld's age and physical condition, when combined with the paramount need to require restitution in this case, suggest that a substantial term of home confinement is a better result than a prison sentence.

Mr. Hochfeld's psychiatric condition is described in detail in the letter from Dr. Kevin Kelly, attached as Exhibit J. At the time his conduct came to light, Mr. Hochfeld's depression was so acute that he had to be admitted to a psychiatric hospital for five days because he was suicidal. Id., at p. 2. Fortunately, the intensity of that episode has passed, and Mr. Hochfeld stands ready to accept the Court's sentence, whatever it may be.

Dr. Kelly's report is helpful in understanding why Mr. Hochfeld got involved in the behavior that ultimately brings him here, particularly when it is read in conjunction with the PSR, and the letters submitted by Mr. Hochfeld's associates and investors.

Mr. Hochfeld is an only child of doting parents, whose father passed away when the defendant was quite young. His mother focused a great deal of attention on her only son, when her husband sickened and died. Mr. Hochfeld knew he was gay from an early age, but to placate his mother, he tried to marry a woman. When his marriage inevitably failed, Mr. Hochfeld never allowed himself to fall in love with another person, because he was ashamed of his homosexuality.

Mr. Hochfeld did develop close friendships over the years, and many of his friends ultimately became investors in Heppelwhite. As his friend Chuck Winebrenner notes, Mr. Hochfeld had few "living relatives and only a few close friends ... over the years he has considered my family His family, as my wife and son and I would visit him on special occasions and on vacation in the summer." Exhibit K. As the Court can see from the letters written by Mr. Hochfeld's friends and investors, this sort of relationship became typical for Mr. Hochfeld, as he withdrew from more intense personal relationships and came more and more to rely on his friends for the emotional support more often supplied by a spouse or partner.

In time, Mr. Hochfeld enjoyed modest success as a securities analyst and as an investor, and he earned a significant amount of money for himself and his friends/investors, whom he invited to invest with him in the technology sector stocks he followed. The admiration of his friends and investors gave him a sense of self-esteem that he was not able to find in his personal life, because he could not act on his sexuality. Instead of finding another person with whom he could build a life, through the years, Mr. Hochfeld "used the purchasing of luxury goods in a

8

continuing but unsuccessful effort to remedy his self-esteem difficulties." Exhibit J at p. 2. At some level, Mr. Hochfeld fell in love with his possessions, because he could not fall in love with another person. He never told anyone of his homosexuality, because of his shame and reluctance to act on his feelings.

Over time, Mr. Hochfeld purchased a significant amount of expensive antique furniture and antique ceramics, and many of these items were purchased on credit. When the market turned, Mr. Hochfeld could not continue to finance his obsession with antique furniture and ceramics, and he was not ready to admit to his friends and investors that he could not continue his lifestyle as it was.[2] Nor was he ready to part with the hundreds of items he had purchased over time and become attached to – he simply could not bear to let things go, because owning them helped to make him feel important and "whole." Without adequate cash flow to finance his obsession with objects, Mr. Hochfeld withdrew all the funds in his capital account at Heppelwhite, and, when those funds ran out, he continued withdrawing funds with the help of the Fund's Administrator, in a desperate attempt to hold on to his antique collection and float his lifestyle long enough for things to turn around. Ultimately, things didn't turn around, and Mr. Hochfeld finds himself before the Court.

With Dr. Kelly's help, Mr. Hochfeld has come to terms with who he is and his foolish obsession with the items he purchased. He is in the process of shedding virtually everything he owns, as part of an effort to make good to his friends and investors. He recognizes that his relationships with them are far more important than his relationships to the antique collection he

---

[2]  Mr. Hochfeld's personal finances were devastated by the downturn in the real estate and securities markets during the financial crisis. His home went into foreclosure (and it is still in foreclosure), and that home is now valueless, and Mr. Hochfeld's car was repossessed when he could no longer afford to pay the lease on it. Ultimately, Mr. Hochfeld will be forced out of his home (at the present time he lives there without paying anything, so it is the cheapest way to live), and he understands that he will be forced to live in the future in very restrictive and diminished circumstances, if he is lucky enough to receive a sentence of home detention. Mr. Hochfeld accepts that, and hopes for it, because it is the one chance he will have to re-pay his victims and feel that he has rehabilitated himself in the eyes of his friends.

built up in a life-long buying spree. His hope is that, at the end of the process, he will have nothing of value, but will maintain a few of his relationships with his friends, and will have an opportunity to continue making good on his debts.

### 2. Mr. Hochfeld's Character

Mr. Hochfeld is not a heartless thief. Nor has he ever been an avaricious person motived by a love of money. The letters written to the Court on behalf of Mr. Hochfeld by his long-term friends – many of whom were also investors in the Heppelwhite Fund – attest to this.

For example, Anthony Williams, who married Mr. Hochfeld's only relative, Beth Williams, writes that, during his divorce from Beth, Hochfeld was "scrupulously neutral and ... provided me with a great deal of moral support." As a result, after Mr. Williams' divorce from Beth, he and Mr. Hochfeld remained good friends. Mr. Williams notes that he has had financial dealings with Hochfeld over many years, and that he was an investor in Heppelwhite at one point. Throughout that period, Mr. Williams found that Mr. Hochfeld "bent over backwards to make sure that I had transparency and a good outcome," and he believes that Mr. Hochfeld's "recent conduct can be seen as an extreme aberration to his lifetime of accomplishment and fair dealing." A copy of Mr. Williams' letter is attached as Exhibit L.

Wayne Bandini and his son Steven also write of Mr. Hochfeld's fundamental decency. Wayne Bandini describes how, when he suffered from extreme back pain during a business partnership with Mr. Hochfeld, "Bert went out of his way, like a family member, to ask how I was progressing and to offer his concern for my recovery." Exhibit M. And Wayne's son Steven speaks of having "experienced Bert's goodhearted, caring nature as long as I can remember," and gives the example of Mr. Hochfeld "spen[ding] an hour on the phone" to help him with homework as a child. Exhibit N.

10

In a similar vein, Steven James, who has known Mr. Hochfeld for almost 30 years, and who was an investor in the Fund for many years, describes how Hochfeld refused to "play hardball" with him in a real estate transaction, and was "willing to wait for his money" even though he didn't need to do so. Mr. James was so impressed by Mr. Hochfeld's sense of fairness and sympathy he became a life-long friend, and rushed to his side in October 2012, when he learned that Hochfeld had become suicidal. Ultimately, Mr. James took Mr. Hochfeld to the hospital for psychiatric treatment, when it became clear that Mr. Hochfeld had become a danger to himself. A copy of Mr. James' letter is attached as Exhibit O.

Mr. Hochfeld has often reached out to help his friends when they were in trouble, and that is why so many of them – even those harmed by his conduct – are prepared to do the same for him. For example, Scott Wilfong describes how Mr. Hochfeld helped him get control of a drinking problem and get back to work. As Mr. Wilfong puts it,

> ...Not only did Bert help me become aware of my drinking problem, keep in touch with me to make sure I was ok, help me get a job when I was ready, he also let me stay at his house anytime I had to go to NYC. When I was restarting and broke these acts of kindness were critical in building my confidence back up and setting me on a healthy path.

Exhibit P. Similarly, Steven Flahive writes to describe how

> Bert has been an excellent mentor to me and many on our team in the IT investment space ... and has always been a true friend to me and many others I know....
>
> Over the past 18 or so years, I personally have seen Bert help, guide, mentor and in general be an excellent asset to the community. He has reached out to numerous friends/contacts of mine that were having personal problems. He has aided children with their college needs and given jobs to some that others would not.

Exhibit Q.

11

In fact, Mr. Hochfeld has frequently done things to help those less fortunate than he. Harry Haygood writes to tell the Court how Mr. Hochfeld "has given food, articles of clothing, shoes, dishes, etc. to the people of my church ... [who] were deeply grateful to have such a giving and caring man in their corner." Exhibit R. Mr. Haygood notes that Mr. Hochfeld has "'fallen from grace, and there is no excuse for his wrong doing." Despite this, Mr. Haygood "feel[s] that incarceration would be bad for an intelligent man who got 'off track' with the current economic conditions" and he stresses that Mr. Hochfeld "should be ordered to pay restitution for all those harmed by his inappropriate actions" while "providing community service to less fortunate individuals." Id.

Perhaps the best example of Mr. Hochfeld's generosity to one less fortunate than he is his support of Fernando Pesantez. In his letter, Mr. Pesantez describes how Mr. Hochfeld's help and support enabled him to reach a life-long goal of studying architecture. Exhibit __. As Anthony Williams notes, with Mr. Hochfeld's help, Mr. Pesantez has become the first member of his family to graduate from college. Exhibit L. And Tatiana Vasquez, Mr. Pesantez's girlfriend, describes how kind Mr. Hochfeld has been to her and Mr. Pesantez in her letter to the Court. Exhibit T.

Finally, Kathy Olstein of the FSW Literacy Volunteers Program confirms that Mr. Hochfeld is now teaching a weekly English as a Second Language course to help those in his community who are struggling to learn English and improve their lot. Exhibit U. When he hit bottom and confessed his wrongdoing to his friends and investors, Mr. Hochfeld decided that he should do more to establish personal relationships with the less fortunate in his community. As a result, he has now channeled his energies into a community activity that gives him greater satisfaction than acquiring objects, because it encourages him to make a personal connection to

12

others and contribute to his community in a positive way.  Mr. Hochfeld hopes to continue his

work in the community in which he lives, and he would welcome a directive that he perform

community service as a component of any sentence the Court may impose.

Mr. Hochfeld is something more than a remorseless criminal.  Other letters describing his

fundamentally good nature are attached together as Exhibit V.

**ARGUMENT**

**THE COURT SHOULD IMPOSE
A NON-GUIDELINES SENTENCE**

While we do not quarrel with the Probation Department's calculation of Mr. Hochfeld's

sentencing guidelines, we respectfully submit that Mr. Hochfeld should receive a sentence that is

significantly lower than the sentencing range recommended by the sentencing guidelines for a

number of reasons.  First, as is the case in many property crimes, the sentencing guidelines

"loss" results in an inappropriately high sentencing for Mr. Hochfeld.  Second, the series of

overlapping, upward adjustments dictated by Sentencing Guidelines Section 2B1.1 result in a

sentencing range that overstates the appropriate sentence for Mr. Hochfeld.  Third, Mr.

Hochfeld's extraordinary efforts to make restitution to his victims warrant a sentence that is

below the otherwise applicable guidelines range, particularly because such a sentence will permit

him to continue his efforts to repay his victims.  And finally, a consideration of the factors set

forth in Title 18 Section 3553(a) weighs in favor of a sentence well below the six and a half

years to eight years sentence recommended by the Sentencing Guidelines.

**A.     The "Loss" Overstates the Seriousness of the Offense**

The Courts have frequently noted that "the Sentencing Guidelines for white-collar crimes

[can produce] a black stain on common sense." United States v. Parris, 573 F. Supp. 2d 744, 754

(E.D.N.Y. 2008).  At least one judge in the Southern District has frequently lamented "the utter

13

travesty of justice that sometimes results from the guidelines fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (Rakoff, J.) (declining to impose the life sentence recommended by the sentencing guidelines and imposing a 42 month sentence instead).  Indeed, it is frequently the case that the Courts depart substantially from the applicable sentencing guidelines in fraud cases like this one, and impose sentences substantially below the sentencing range dictated by a strict guidelines analysis. See, e.g., United States v. Ronald Ferguson, 584 F. Supp.2d 447 (D. Conn. 2008) (imposing sentences of 48 months and 24 months despite a sentencing guidelines range of life imprisonment); United States v. Ovid, 2010 WL 3940724  (E.D.N.Y. Oct. 1, 2010) (imposing a sentence of 60 months when the sentencing guidelines recommended range was 210-262 months, and decrying the rigidity of the guidelines); see also Spears v. United States, 129 S. Ct. 840, 843 (2009) (recognizing a district courts' authority to vary from the Guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case.")

In this case, the Court is confronted with a situation in which a person who led an essentially law abiding life went off the rails near the end of a long and successful career.  In doing so, he did significant harm to his victims, and the defendant does not shy away from that. But even his victims have described the defendant as fundamentally decent, and even his victims believe the defendant's conduct was a significant misstep during a period of economic and psychological stress.  The defendant has demonstrated that he is ready to do all that he can to make restitution to his victims to the extent he can in the years that remain to him.

In these circumstances, the sentencing range calculated by the guidelines simply makes no sense and imposing a sentence of six and a half or more years will do no good for anyone. Society will not be made safer by such a sentence in this case, and it will incur a significant cost to incarcerate Mr. Hochfeld for six and a half years or more. Mr. Hochfeld's victims won't be made any safer by such a sentence -- their remaining funds have already been escrowed beyond Mr. Hochfeld's reach, and they have already, together with Mr. Hochfeld, begun the process of liquidating Mr. Hochfeld's assets. And the likelihood that Mr. Hochfeld's victims will ever be made whole would be diminished by such a sentence, since Mr. Hochfeld has precious few years of working life remaining to him. For all these reasons, we submit that the Court should impose a sentence that will very significantly restrict Mr. Hochfeld's liberty, but which will permit him to do what he can to make amends while he is still able to do so.

### B.    Overlapping Adjustments Result in an Overstated Sentencing Range

The Courts have long observed that in cases like this one, the adjustments required by the Sentencing Guidelines tend to overlap and result in an inflated sentencing range. See United States v. Jackson, 346 F.3d 22, 26 (2d Cir. 2003); United States v. Lauerson, 348 F.3d 329, 343-44 (2d Cir. 2003); Parris, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (complaining that the Guidelines in security fraud prosecutions "are patently absurd on their face" due to the "piling on of points" under § 2B1.1). In such cases, the Circuit has specifically suggested that a sentence below the sentencing range recommended by the Sentencing Guidelines may be appropriate. United States v. Jackson, id. We respectfully suggest that this case is one in which the various adjustments applied to Mr. Hochfeld's sentencing guidelines overlap and "combine to have a cumulative effect that is present 'to a degree' not adequately considered by the [Sentencing]

Commission," id., such that the Court should consider imposing a sentence below the applicable guideline range.

In the present case, Mr. Hochfeld's sentencing guidelines range is first increased sixteen levels because of the significant amount of loss caused by his conduct. Then, his guidelines are increased two levels because his conduct harmed a number of victims. Then, his guidelines are increased another four levels because of Mr. Hochfeld's position as an investment advisor. Each of these adjustments significantly increases Mr. Hochfeld's sentencing exposure, and these adjustments overlap with each other: a large loss adjustment is to be expected where there are more than 10 victims, and the increase because of the size of the loss and the increase because of the number of victims are, in this case, adjustments that get at the same basic sentencing principal – where there is a significant amount of harm the punishment should increase. Moreover, in nearly every case in which a defendant is an investment advisor, it is likely that a fraud upon his clientele will harm many victims, and that the amount of the harm will add up quickly to a significant amount. So this adjustment also tends to overlap with the adjustments for loss and number of victims.

Even though these three adjustments to Mr. Hochfeld's base offense level do not amount to "double counting," they do overlap, and combine in the circumstances of this case to have a cumulative effect not fully considered by the Sentencing Commission. For these reasons, as well as those stated above, we respectfully submit that a sentence below the applicable sentencing range is entirely appropriate.

### C.   Mr. Hochfeld's Extraordinary Efforts to Make Restitution

Mr. Hochfeld's conduct in attempting to make restitution to his victims is truly extraordinary. He has consigned for auction or sale virtually every item of his personal property

16

that has value, and he has facilitated an orderly liquidation of his property in a manner that will save the victims of his crimes many of thousands of dollars by making the appointment of a receiver unnecessary in the SEC's case against him.  Mr. Hochfeld began this process before his arrest in this case, and he has continued it during the period following his arrest.  As is noted above, the first sale of a portion of Hochfeld's property by Christies has already resulted in gross receipts of more the $100,000, which will be distributed to Mr. Hochfeld's victims on a pro rata basis.[3]

The sentencing guidelines do not address a situation like that presented in this case. While Section 5E1.1 of the Guidelines provides that the Court must order restitution at the time of sentencing, it makes no mention of a situation in which a defendant has confessed his wrongdoing to his victims and begun a cooperative restitution process supervised by the victims *prior to his arrest.*  And, while the Application Notes to Section 3E1.1 of the Guidelines generally describe "voluntary payment of restitution prior to adjudication of guilt" as a basis for finding that the defendant has accepted responsibility for his wrongdoing, they certainly do not contemplate the complexity of Mr. Hochfeld's situation, and they do not account for the fact that Mr. Hochfeld's actions in this case have saved the victims of his crimes many thousands of dollars in the form of receiver's fees and possible litigation expense.

When the Court considers Mr. Hochfeld's actions in this regard, it should compare him to the many other criminal defendants it has sentenced.  How many of them met directly with their victims prior to arrest and established a plan with them to ensure that restitution payments would be made in an efficient manner?  How many of them wound down their businesses for the benefit of their victims, before the SEC ever obtained injunctive relief?   How many of them

---

[3]   Mr. Hochfeld also has approximately $28,000 in personal and business bank accounts that have been restrained by the SEC, and he anticipates that these funds will also be paid out to his victims as part of the SEC' settlement with him.

assigned virtually their entire estates to their victims to ensure that the maximum amount of

restitution might be received by them? How many of them supervised the sell-off of their assets

to ensure that the maximum amount would be received by their victims? How many of them re-

started a business at the age of 67, in order to earn the income to re-pay their victims?[4] In

counsel's long experience as a criminal defense lawyer, this is the only case of its type, and Mr.

Hochfeld's efforts to pay back his victims are truly extraordinary.

In considering Mr. Hochfeld's actions, the Court should weigh the precedential value of a

reduction in sentence for Mr. Hochfeld against the precedential value of a guidelines sentence for

him as another white collar criminal that must be punished for his crimes. See United States v.

Rangel, 697 F.3d 795, 803-4 (9th Cir. 2012) (observing that "the district court's goal of obtaining

restitution for the victims of Defendant's offense, 18 U.S.C. § 3553(a)(7), is better served b y a

non-incarcerated and employed defendant."); United States v. Peterson, 363 F. Supp. 2d 1060,

1061-2 (E.D. Wis. 2005) (granting a variance from guidelines range and holding that

§ 3553(a)(7) weighed in favor of a non-jail sentence "where defendant had a reasonably well-

paying job and the restitution amount was manageable"). Will a guidelines sentence deter others

like Mr. Hochfeld from committing similar crimes? For the reasons stated fully below, we

respectfully submit that it will not. Might a reduction in sentence encourage other criminals to

participate fully in the restitution process and ensure that the maximum amount of restitution is

garnered by their victims with a minimum of expense and delay? We respectfully submit that it

may, and for that reason, a significant reduction in the sentence that the Court would otherwise

---

[4]  At the present time, Mr. Hochfeld's independent research blog earns him approximately $5700 per month. The
sentence the Court will impose should require Mr. Hochfeld to pay a significant part of this sum, and a significant
percentage of any future earnings, to his victims. If Mr. Hochfeld is incarcerated, he will be unable to follow the
companies on which he reports and to publish his blog – there are no Blumberg machines and there is no access to
the internet in the Bureau of Prisons facilities. Incarceration will cause Mr. Hochfeld's fledgling business to fail,
even though it appears to have some hope of generating the cash necessary to repay Mr. Hochfeld's victims at least
some of their losses over time. If Mr. Hochfeld's business fails, his victims' hope of receiving periodic payments
from him in the future is nil.

impose on Mr. Hochfeld is warranted. Such a sentence will encourage others like Mr. Hochfeld to do as he has done, and make good on their debts to their victims to the maximum extent possible.

**D.     A Review of the Section 3553(a)(2) Factors Weighs in Favor of a Sentence of Probation**

Title 18 U.S.C. § 3553 provides that the Court should consider the need for the sentence it imposes "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). This section of the Code essentially asks the Court to consider the defendant and his actions holistically, and to "provide just punishment" in light of all the facts known to the Court.

While Mr. Hochfeld's offense is serious, there is no question that a substantial sentence of probation with home detention is a serious one, and will promote respect for the law and provide just punishment, particularly in circumstances like those in this case, where such a sentence will provide the defendant with a significant opportunity to continue the process of making restitution to his victims. See Gall v. United States, 128 S. Ct. 586, 595-96 (2007) (a probationary sentence imposes a significant restraint on the liberty of a defendant).[5]

The second factor listed in 18 U.S.C. § 3553(a)(2) is to "afford adequate deterrence from criminal conduct." 18 U.S.C. § 3553(a)(2)(B). This factor focuses on general deterrence of the public from committing criminal conduct of the type the defendant has engaged in.

With respect to general deterrence, Mr. Hochfeld submits that a lengthy term of probation with home detention for the purpose of requiring Mr. Hochfeld to work to repay his victims will

---

[5]   During the period when Mr. Hochfeld has been on bail, the Pretrial Services Agency has found him to be an ideal supervisee. Mr. Hochfeld respectfully requests that the Court contact his supervising Pretrial Services Officer, Joseph Zampano, and inquire about whether Mr. Hochfeld would be a good candidate for home detention. We are confident that Officer Zampano will describe Mr. Hochfeld as a person who would be easy to supervise, and as a good candidate for home detention. Mr. Zampano can be reached at (203) 579-5578.

provide adequate general deterrence to the criminal conduct of others. Anyone who finds out that Mr. Hochfeld has lost everything as a result of his actions, in exchange for home detention and the legal requirement to repay his victims a significant part of his future income and to report to a probation officer regularly as part of his term of probation, will be deterred from doing as Mr. Hochfeld has done. Thus, a sentence that provides for a term of probation combined with home detention will provide good *general* deterrence to future criminal conduct, as required by Section 3553(a)(2)(B), to the extent such deterrence can be effective.[6]

The third factor listed in 18 U.S.C. § 3553(a)(2)(C) focuses on specific deterrence of further criminal conduct by the defendant himself. It requires to the Court to consider the need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). If the Court imposes a term of probation with home confinement on Mr. Hochfeld, combined with a strict restitution order, such a sentence will certainly provide good *specific* deterrence to prevent Mr. Hochfeld from committing any further crimes, as he will be monitored by a probation officer for an extended period, and will therefore have little opportunity to engage in further criminality. In fact, a strict restitution requirement will result in Mr. Hochfeld's financial transactions being closely monitored by the Probation Department, and Mr. Hochfeld is willing to accept any form of financial monitoring the Court may see fit to impose. And, if the Court makes it a condition of sentence that Mr. Hochfeld continue to seek and obtain mental health treatment, as we submit that it should, the chances that Mr. Hochfeld will drift back into criminality will be reduced.

---

[6]  It is doubtful that any sentence of incarceration will deter another "white collar" criminal from doing as Mr. Hochfeld did when he dipped into his investors' funds to support himself. The fact is that in most cases, these sentences go unnoticed by the general public, and the persons who commit crimes of the type charged in this case do so without considering the penalties that might be imposed. That is certainly true of Mr. Hochfeld, who committed the crime charged in this case long after the government began its well-publicized campaign of obtaining lengthy sentences for Wall Street criminals. Examples of lawyers, investment advisors and others "borrowing" their clients' funds with a belief that "the market will turn" or "things will get better" or "I will pay them back eventually" are as old as the criminal code itself, and they will continue as long as human beings are the imperfect mix of greed and impulsivity that they are. Lengthy sentences won't change any of this. But a strict regime of restitution will at least give Mr. Hochfeld's victims a chance to recover all or much of their loss.

20

Thus, here, too, there is no need to impose a prison sentence on Mr. Hochfeld to satisfy the requirements of Title 18 United States Code, Section 3553(a)(2)(C).

18 U.S.C § 3553(a)(2)(D) speaks of the need for a sentence to "provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner." We respectfully submit that no incarceration is needed in order to ensure Mr. Hochfeld's rehabilitation. Incarcerating Hochfeld won't do a thing to ensure that he continues to do all that he can to repay his victims – in fact, incarceration will make it a certainty that Hochfeld will not be able to continue paying his debt to his victims. And incarceration will not provide Mr. Hochfeld any needed education or vocational training – at 67, Mr. Hochfeld is not about to be retrained for a new career. Nor is incarceration necessary to ensure that Mr. Hochfeld continues to receive necessary psychiatric and medical care. Doctor Kelly continues to provide psychiatric care to Mr. Hochfeld on a pro bono basis, and will continue to do so if Mr. Hochfeld is sentenced to probation. Exhibit J. Thus, an analysis of this factor also suggests that a sentence of incarceration is unnecessary.

Finally, 18 U.S.C. § 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense." We respectfully submit that this goal should be paramount in sentencing a defendant for an economic crime like this one. Making Mr. Hochfeld's victims as whole as possible should be everyone's – including Hochfeld's – main goal. A probationary/home confinement sentence that permits Mr. Hochfeld to work to pay his victims will accomplish this goal. A jail sentence will not.

In this case, five of Mr. Hochfeld's victims – Chuck Winebrenner, Kal Crawford, Richard Grace, Frank Jerd and Scott Wagner – have written to the Court in support of Mr. Hochfeld. They have all noted that it would be a waste to incarcerate Mr. Hochfeld at this point.

21

These five victims represent approximately 50% of the equity in the Heppelwhite Fund, and each of them believes that his best hope of recovery is to permit Mr. Hochfeld to remain at liberty – in a very circumscribed and closely monitored way – so that he can work to pay them back. Mr. Hochfeld respectfully submits that this view is likely shared by many other victims of his crime, because it is, realistically, the only way in which the victims are likely to be repaid.

As is indicated by the foregoing analysis, the various relevant factors set forth in Title 18 United States Code Section 3553(a) all weigh in favor of a sentence of probation with home detention, and a strict requirement of restitution payments.

### E. If the Court Imposes a Jail Sentence, Hochfeld Requests a Recommendation That He be Incarcerated at the Minimum Security Facility at Fort Dix

If the Court decides to impose a jail sentence on him, Mr. Hochfeld respectfully requests that the Court include in its Judgment a recommendation that Mr. Hochfeld be housed at the minimum security facility located at Fort Dix, New Jersey. Such a recommendation will permit Mr. Hochfeld to be incarcerated near his friends and few family members, most of whom are located in the Northeast and mid-Atlantic regions of the United States and it will make it easier for those persons to visit Mr. Hochfeld.

### F. If the Court Imposes a Jail Sentence, Hochfeld Requests that He be Permitted to Surrender after October 20, 2013.

The last auction of property consigned by Mr. Hochfeld to Christie's and Doyle's' is scheduled to take place on October 20, 2013. Mr. Hochfeld's presence is important to assist Christie's and Doyle's' in their sale of his property. Therefore, if the Court does sentence him to a term of incarceration, Mr. Hochfeld respectfully requests that the Court permit him to surrender on a date after October 20, 2013, so that he may continue to assist the auction houses with the sale of his extensive and varied collection of antiques.

22

## CONCLUSION

For all the foregoing reasons, Berton Hochfeld respectfully requests that the Court

impose a non-jail sentence on him.

Dated: New York, New York
      July //, 2013

SERCARZ & RIOPELLE, LLP

By: _____
Roland G. Riopelle, Esq. (RR-2950)
Diane Ferrone, Esq. (DF-8023)
810 Seventh Avenue, Suite 620
New York, NY  10019
(212) 586-4900
Fax (212) 586-1234

*Attorneys for Defendant Berton Hochfeld*
